AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| | ) Case No. |
| Jordan Tito | ) |
| | ) **8:16MJ1650JSS** |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __September 21, 2016-present__ in the county of __Hillsborough__ in the __Middle__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1029(a)(3) and 1028A | Access device fraud and aggravated identity theft. |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Bryan Halliwell, Special Agent USSS
Printed name and title

Sworn to before me and signed in my presence.

Date: 10/5/16

_____
Judge's signature

City and state: Tampa, Florida

Julie S. Sneed, U.S. Magistrate Judge
Printed name and title

## **AFFIDAVIT**

I, Bryan Halliwell, Special Agent, United States Secret Service, being duly sworn to tell the truth, state the following information:

1. I am employed as a Special Agent with the United States Secret Service and have been so employed since April 2000. I am currently assigned to the Tampa Field Office. During the course of my career with the United States Secret Service, I have led, conducted, and participated in criminal investigations involving bank fraud, wire fraud, identity theft, and access device fraud.

2. The facts set forth in this affidavit are based on my personal knowledge, information and documents provided to me in my official capacity, information obtained from other individuals, including law enforcement officers involved in this investigation, my review of documents and records related to this investigation, communications with others who have personal knowledge of the events and circumstance described herein, and information gained through my training and experience. The statements contained in this affidavit are true and correct to the best of my knowledge and belief.

3. Based on the information contained in this affidavit, I believe there is probable cause to charge **Jordan Tito** with access device fraud and aggravated identity theft, in violation of 18 U.S.C. §§ 1029(a)(3) and 1028A.

4. This affidavit is intended to demonstrate only that there exists probable cause to support a complaint to charge **Jordan Tito** with access device fraud and

aggravated identity theft and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in the affidavit are related in substance and in part only.

## PROBABLE CAUSE

### A. Introduction

5. In an effort to aid in the review of this affidavit and provide an overall understanding of the scheme, I will summarize the nature of the fraudulent activities identified during this investigation to date. Attribution of these facts will follow. In sum, I have probable cause to believe from at least in or around September 21, 2016, through and including the present, **Jordan Tito** engaged in a scheme to defraud United States citizens by obtaining and selling for profit stolen identification documents that feature the stolen personally identifiable information (PII) of unknowing third parties, including names, dates of birth, and social security numbers.

### B. Details of the Investigation to Date

6. From at least in or around July 2015, until and including in or around February 2016, a cooperating target in another case, known here as CT#1, purchased or stole credit and debit card numbers and encoded the stolen account numbers onto other credit or gift cards using an encoder and a computer. CT#1 and others then embossed the newly created credit or gift cards with various names and numbers using an embosser and either sold the counterfeit credit cards for cash or used the counterfeit credit cards to

purchase cell phones and high-end appliances, among other things, which they sold for cash. Evidence gathered to date also showed that CT#1 manufactured counterfeit State of Florida driver's licenses and identification cards at his/her place of business. These identification documents typically featured the photograph of the purchaser of the ID but the PII of an unknowing identity theft victim with good credit. CT#1 sold these counterfeit driver's licenses and ID cards and also had his/her buyers use them to purchase cell phones with the identity theft victim's credit. CT#1 then sold the cell phones at his/her place of business.

7. CT#1 pleaded guilty in the U.S. District Court for the Middle District of Florida, Tampa Division, in or around August 2016, to one count of access device fraud and one count of aggravated identity theft. CT#1 has not yet been sentenced. CT#1, along with his/her attorney, agreed to be debriefed by law enforcement. Your affiant and others working with CT#1 have found information he/she provided to date to be reliable. CT#1 has a prior felony conviction for trafficking in cocaine, for which he/she is currently on probation, and has not received any benefit for his/her cooperation in the instant investigation thus far.

8. In or around September 2016, during his/her cooperation, CT#1 told investigators, including your affiant, that he/she has an acquaintance, later identified as **Jordan Tito**, who would sell him/her identities, to include names, dates of birth, and social security numbers for $10 each. According to CT#1, he/she was introduced to the individual later identified as **Tito** by a mutual

acquaintance. CT#1 stated this mutual acquaintance knew CT#1 was looking to purchase identities and that **Tito** had them to sell. CT#1 also identified a photo of **Tito** maintained by the State of Florida Driver and Vehicle Information Database. After seeing the photo of **Tito**, CT#1 recalled that CT#1 had purchased cell phones from **Tito,** held at **Tito's** place of employment, which was a Metro PCS store in Tampa, FL.

9. On or about September 21, 2016, CT#1, at the direction of investigators, including your affiant, placed a consensually monitored telephone call to **Jordan Tito** at XXX-XXX-9579. During the conversation, **Tito** stated, "You said you wanted the 50 or no?" ... "There is other people like that I have to buy as well," ... "They coming with more money," ... "They're paying umm 30 for them but I'll do 10 for you there's no problem." ... "When they're buying I let them pick however many they want." ... "I had 200. I sold 150 of them." ... "I got like 54." CT#1 told **Tito** that CT#1 needed more than the 50 identities **Tito** was offering and that CT#1 needed at least 100. CT#1 asked **Tito** to send CT#1 an example of the materials containing the stolen identities and **Tito** agreed.

10. During the call described above, **Tito** sent CT#1 two text messages. One text contained a photograph of a printed document with the PII of identity theft victim E.B., who resides in California, that included the name, date of birth, social security number and address of E.B. The second text contained a photograph of the State of California driver's license for J.H. along with a Medical Examiner's report of fitness for J.H. so that J.H. could be a licensed

4

truck driver. This text contained J.H.'s name, date of birth, address, and telephone number. During the call described above, **Tito** stated, "Do you get picture messages while you're on a phone call?" ... "One sheet has one name," ... "The member ID is where you see the social" and "I'll have the 50 ready for you." CT#1 told **Tito** that he/she uses the PII to purchase cell phones and that he/she would call him back after CT#1 downloaded the pictures **Tito** sent.

11. Continuing on or about September 21, 2016, CT#1 forwarded your affiant a text message conversation that he/she had with **Jordan Tito** at phone #XXX-XXX-9579 on or about the same day. In the text messages **Tito** stated, "Do you know anyone who needs children info?" CT#1 replied, "I take any ages." **Tito** replied, "Ok I have 80 for you then" and "Is that good?" CT#1 replied, "Yes I call u in a minute" and "I will buy the 80." **Tito** replied, "No problem" and "Ok bro."

12. Continuing on or about September 21, 2016, CT#1, at the direction of investigators, including your affiant, placed a consensually monitored telephone call to **Jordan Tito** at XXX-XXX-9579. CT#1 told **Tito** the documents look good and asked to meet up with him/her on Friday to purchase the 80 documents containing PII. **Tito** agreed to meet CT#1 on Friday and stated, "I work from like eleven to eight."

13. Continuing on or about September 21, 2016, your affiant conducted additional investigation and learned that the telephone number XXX-XXX-9579 is a wireless number issued to **Jordan Tito** of 1017 E. Ida Street,

5

Tampa, FL 33603 and the account has been active for approximately four to six months. Further investigation revealed that **Tito's** parents' driver's licenses list 1017 E. Ida Street, Tampa, FL 33603 as their home residence.

14. On or about September 22, 2016, CT#1 forwarded your affiant a text message conversation that he/she had with **Jordan Tito** at phone #XXX-XXX-9579 on or about the same day. In the text messages CT#1 stated, "Can we meet tomorrow morning at the wells Fargo bank in Florida." **Tito** replied, "Yea I got to be to work at 10." CT#1 stated, "Can we meet up around 9 to 9:30 in the bank in N. Florida." **Tito** replied, "9" and "I don't want to be late." CT#1 texted back, "Ok cool be there at 9," to which **Tito** replied, "Ok."

15. On or about September 23, 2016, CT#1 met with your affiant and other law enforcement officers in preparation for the deal to purchase stolen PII from **Jordan Tito**. CT#1 was searched, as was his vehicle, to ensure that CT#1 was not in possession of any contraband, in particular documents containing PII. CT#1 was also equipped with an audio recording device.

16. Also on or about September 23, 2016, CT#1 forwarded your affiant a text message conversation that he/she had with **Jordan Tito** at phone #XXX-XXX-9579 on or about the same day. In the text messages CT#1 stated, "I just got here" and "Driving a white Lexus." **Tito** replied, "I got stuck in traffic give me 10 minutes" CT#1 replied, "Ok" and **Tito** replied, "Pulling up next to you".

6

17. Continuing on or about September 23, 2016, **Jordan Tito** met with CT#1 in the Wells Fargo Bank parking lot located at 12233 N. Florida Avenue, Tampa, FL. **Tito** was observed by investigators, including your affiant, arriving in a Gray 2011 Chevrolet Impala bearing State of Georgia license plate #QAL8324. CT#1 was observed by investigators, including your affiant, exiting his white Lexus and getting in the front passenger side of the 2011 Gray Chevrolet Impala driven by **Tito**. Audio surveillance on CT#1's person captured the transaction between **Tito** and CT#1. **Tito** sold CT#1 approximately 86 stolen identities, each of which was printed out on 8x11 pieces of paper. These documents each included the name, address, date of birth, and social security number of the identity theft victim. Each of victims are members or associates of the California Teamsters Union. CT#1 gave **Tito** $800 in United States currency that was provided to CT#1 by law enforcement prior to the meeting for the purchase of the identities.

18. During the exchange, **Tito** stated, "I only brought some with ID." A review of the stolen PII sold by **Tito** shows that in approximately six instances, the printed medical record of the identity theft victim is followed by a page containing a photocopy of the same ID theft victim's driver's license. During the sale, **Tito** went on to state, "I can probably get you like another thousand of them" and "I didn't know you took children too, it will probably be more than a thousand." CT#1 advised **Tito** he/she was going to count them to make sure there were 80 identities, to which **Tito** responded, "Its 84 actually. I let 4 go because I know it didn't matter but..." The meeting ended with CT#1

7

agreeing to contact **Tito** at a later date. CT#1 was observed by investigators, including your affiant, exiting **Tito's** vehicle holding a green folder/binder and entering his/her White Lexus.

19. After the transaction, CT#1 turned over the green folder/binder that contained the identity documents to your affiant. Your affiant reviewed the documents sold by **Tito** and determined CT#1 received approximately 86 different stolen identities, of which approximately 29 were children. CT#1 stated that **Tito** was wearing a Metro PCS shirt, which triggered CT#1's memory that **Tito** worked at the Metro PCS store at the corner of N. Dale Mabry Highway and W. Columbus Drive in Tampa, FL.

20. Continuing on or about September 23, 2016, your affiant conducted additional investigation and learned that the State of Georgia license plate number QAL8324 was registered to R.D. of Conley, GA. Your affiant also learned that R.D. has a State of Florida driver's license with a listed address of 1017 E. Ida Street, Tampa, FL 33603, which is the same address associated with **Jordan Tito**.

21. Continuing on or about September 23, 2016, SA Jeremy Fillie, FDLE, and your affiant went to the Metro PCS store located at 2907 N. Dale Mabry Highway, Tampa, FL 33607 and observed the 2011 Chevrolet Impala bearing State of Georgia license plate number QAL8324 parked in front of the store.

22. On or about September 24, 2016, CT#1 forwarded your affiant a text message conversation that he/she had with **Jordan Tito** at phone #XXX-XXX-9579 on or about the same day. In the text messages **Tito** stated,

"Todo bien?" which translates to "All Good?" CT#1 replied, "Yes everything good bro" and "When can you get me more I need like 1100." **Tito** replied, "Give me a week." CT#1 stated, "Ok any age is fine" and **Tito** replied, "Ok kool."

23. On or about September 25, 2016, CT#1 forwarded your affiant a text message conversation that he/she had with **Jordan Tito** at phone #XXX-XXX-9579 on or about September 24, 2016. In the text messages **Tito** stated, "Is it ok if I get u the sheets have 35 names per page? It makes it faster?" CT#1 replied, "Yes that's fine." **Tito** stated, "Great I'll have 200 Tuesday."

24. On or about September 26, 2016, CT#1 forwarded your affiant a text message conversation that he/she had with **Jordan Tito** at phone #XXX-XXX-9579 on or about the same day. In the text messages CT#1 stated, "I'm going to be out of town till next week so try to get 1k or more I have the money ready" and **Tito** replied, "Ok I'll try for 1k."

25. Continuing on or about September 28, 2016, your affiant contacted M.T. whose identity was sold to CT#1 by **Jordan Tito**. M.T. currently resides in Chula Vista, CA. M.T. confirmed his/her date of birth and Social Security number ending in -2698 was correct on the document CT#1 purchased from **Tito**. M.T. stated he/she does not know CT#1 or **Tito** nor did he/she authorize either of them to possess his/her personal identifiers.

26. On or about September 29, 2016, SA Jeremy Fillie, FDLE, went to the Metro PCS store located at 2907 N. Dale Mabry Highway, Tampa, FL 33607 and

9

observed the 2011 Chevrolet Impala bearing State of Georgia license plate number QAL8324 parked in front of the store. SA Fillie entered the store, positively identified **Jordan Tito** based on what he knows **Tito** to look like from his State of Florida driver's license, and confirmed **Tito** was currently employed at the store.

27. Continuing on or about September 29, 2016, your affiant contacted J.S. whose identity was sold to CT#1 by **Jordan Tito**. J.S. currently resides in Oxnard, CA. J.S. confirmed his/her date of birth and Social Security number ending in -0507 was correct on the form CT#1 purchased from **Tito**. J.S. stated he/she does not know CT#1 or **Tito** nor did he/she authorize either of them to possess his/her personal identifiers.

28. Continuing on or about September 28, 2016, your affiant contacted J.L. whose identity was sold to CT#1 by **Jordan Tito**. J.L. currently resides in Anaheim, CA. J.L. confirmed his/her date of birth and Social Security number ending in -6834 was correct on the form CT#1 purchased from **Tito**. J.L. stated he/she does not know CT#1 or **Tito** nor did he/she authorize either of them to possess his/her personal identifiers.

29. On or about September 30, 2016, CT#1 forwarded your affiant a text message conversation that he/she had with **Jordan Tito** at phone #XXX-XXX-9579 on or about the same day. In the text messages CT#1 stated, "How is looking I'm coming back next week." **Tito** replied, "Good." CT#1 replied, "Are u going to have all the numbers by next week" and "I need them as soon as I get back." **Tito** stated, "Not all some though." CT#1 replied,

"How many?" to which **Tito** responded, "400-500." CT#1 then texted, "See if u can get 1k by next Friday I'm coming back and leaving town again just coming back to buy that from u." **Tito** replied, "Ok I'll try." CT#1 texted, "Ok bro let me know I got the money ready 10k" and **Tito** replied, "No problem."

30. Continuing on or about September 30, your affiant contacted B.B. whose identity was sold to CT#1 by **Jordan Tito**. B.B. currently resides in Scotts Valley, CA. B.B. confirmed his/her date of birth and Social Security number ending in -1056 was correct on the form CT#1 purchased from **Tito**. B.B. stated he/she does not know CT#1 or **Tito** nor did he/she authorize either of them to possess his/her personal identifiers.

## CONCLUSION

31. Based on the above facts, your affiant submits probable cause exists that from at least September 21, 2016, through and including the present, **Jordan Tito** committed access device fraud and aggravated identity theft in violation of 18 U.S.C. §§ 1029(a)(3) and 1028A, respectfully requests that this Court issue a warrant for **Jordan Tito**'s arrest.

This completes my affidavit.

_____
Bryan Halliwell, Special Agent
United States Secret Service

Sworn to and subscribed before me
this __5__ day of October, 2016.

_____
Honorable Julie S. Snead
United States Magistrate Judge

11